IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs September 15, 2020

**STATE OF TENNESSEE v. JASON KEITH WOODS**

**Appeal from the Circuit Court for Bedford County**
**No. 18588     Forest A. Durard, Jr., Judge**

————————————————————

**No. M2019-01504-CCA-R3-CD**

————————————————————

Jason Keith Woods, Defendant, was charged in a twelve-count indictment by the Bedford County Grand Jury in May of 2017 for multiple felony drug offenses involving the sell and delivery of the controlled substances oxycodone, heroin and morphine. The offenses occurred during three separate controlled transactions with a confidential informant. After a jury trial, Defendant was convicted of four Class B felony drug offenses, two Class C felony drug offenses and two counts of conspiracy to sell and deliver heroin, also a Class C felony offense. He was also convicted of 4 counts of the lesser included offense of simple possession, a Class A misdemeanor offense. The trial court merged five of the convictions and sentenced Defendant to an effective sentence of twenty years as a Range II, multiple offender. After the denial of a timely motion for new trial, Defendant appealed arguing that the evidence was insufficient, the trial court gave an improper jury instruction, and the trial court sentenced him improperly. After a complete review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Christopher Westmoreland, Shelbyville, Tennessee, for the appellant, Jason Keith Woods.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Mike Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In March of 2016, the 17th Judicial District Drug Task Force was investigating Defendant along with Stephanie Ware Walker and Jeff Akin to ascertain whether they were involved in the illegal distribution of prescription medications and heroin. Agent Shane George, the Assistant Director of the Task Force, learned that on March 24, 2016, Brian Shoemake was in contact with Defendant and Ms. Ware early in the day and inquired whether Defendant would have four, 30-milligram Roxicet tablets for purchase. The controlled substance in Roxicet pills is oxycodone. Mr. Shoemake was acting as a confidential informant ("CI") at the time, and met with Agent George, Assistant Director Timothy Miller, and Special Agent Joe Ramirez to arrange a controlled buy.

Mr. Shoemake had known Defendant and Ms. Ware for about two years prior to this series of transactions and had purchased pills from him in the past. In order to prepare for the controlled buy, Agent George met with Mr. Shoemake at a prearranged location where the agent recorded a telephone call, conducted a search of Mr. Shoemake's person, conducted a search of Mr. Shoemake's vehicle, equipped Mr. Shoemake with a recording device, and provided Mr. Shoemake with documented money in the amount of $140. The controlled buy was scheduled to take place at Defendant's residence in Shelbyville.

Agent George sent other agents to the location of the buy to set up surveillance. Agent George followed Mr. Shoemake to the location of the buy where Agent George saw Mr. Shoemake exit his vehicle and go to the back door of Defendant's residence. The CI entered the residence but Agent George was unable to see who opened the door to let Mr. Shoemake inside. Agent George recognized the voice of both Defendant and Ms. Ware on the transmitter because he was "very" familiar with Defendant's voice and recognized Ms. Ware's voice. During the conversations between Defendant, Ms. Ware, and Mr. Shoemake, Defendant discussed how he was distributing some great quality heroin. Defendant suggested that Mr. Shoemake try heroin because it was economical. Defendant showed Mr. Shoemake some heroin and, according to Mr. Shoemake Defendant "chopped some [heroin] out and did some." Mr. Shoemake also tried "[a] little line" of the heroin but stated that he blew his nose when he left Defendant's house because he did not want the heroin in his system.

After an undisclosed period of time, Mr. Shoemake exited the house through the back door, resumed his position in the driver's seat of his car, and drove to the prearranged meeting location. At that point, Mr. Shoemake turned the four oxycodone tablets and transmitter over to Agent George. Mr. Shoemake was searched to ensure that he did not retain any evidence or money. Agent George spent some time debriefing Mr. Shoemake and, in this case, the information relayed by Mr. Shoemake to Agent George was consistent with what Agent George heard over the transmitter.

Based on conversations after the first controlled buy, Agent George prepared Mr. Shoemake for a second controlled buy on the same day. The same procedure was followed during which both Mr. Shoemake and his car were searched prior to the controlled buy. In addition, Mr. Shoemake was provided with documented cash and outfitted with a transmitter. During the second controlled buy, Mr. Shoemake was prepared to purchase a half a gram of heroin from Defendant for $150. This purchase was initially set to take place at Defendant's residence. Agent George followed Mr. Shoemake to Defendant's residence where Mr. Shoemake was seen entering the back door of the house. Agent George did not have a view of Defendant but was able to hear his conversation with Defendant via the transmitter. Ms. Ware was not heard on the first part of this recording but she returned to the residence after Mr. Shoemake arrived.

Once Mr. Shoemake was inside the house, Agent George could hear Defendant make a telephone call "to his source for heroin" over the transmitter. The source "call[ed] him back and [Defendant and the source] ha[d] a brief telephone conversation." The source for the heroin was parked outside Defendant's residence by this point in a silver, extended cab Ford F-150. According to Agent George, Defendant "ha[d] a hard time believing that [the source was outside], and they ma[d]e arrangements to meet at the source's house."

Special Agent Ramirez, acting as surveillance, followed the truck as it left Defendant's residence. Using the license plate number, Special Agent Ramirez identified the source as Jeffrey Wayne Haithcote and relayed his name and address to Agent George.

Agent George was still observing Defendant's house. He saw Defendant and Mr. Shoemake exit the house and get into Mr. Shoemake's car, a blue mini-van. Mr. Shoemake drove directly to Mr. Haithcote's house on Highway 64 east. Agent George followed Mr. Shoemake and Defendant. Once Agent George arrived at Mr. Haithcote's house, he placed his car in a location where he could observe the house.

Mr. Shoemake and Defendant pulled into Mr. Haithcote's driveway. Defendant got out of the car and walked toward a covered carport. Mr. Shoemake remained in the car. Agent George was unable to hear any conversation that took place outside the car but Defendant came back to the car shortly. Mr. Shoemake drove the car back to Defendant's residence, and Agent George followed. Defendant exited the car and stood on the back porch for a period of time before ultimately going back inside. As a result of Defendant's actions, Agent George waited to leave the area until Defendant reentered the house.

Agent George met Mr. Shoemake at the prearranged location and retrieved the transmitter as well as a tannish brown substance that tested positive for heroin. The recording from the transmitter contained a conversation between Defendant and Mr. Shoemake wherein Defendant discussed trying to find "some skates." Agent George

explained that "skates" is a slang term used for digital scales. Agent George could also hear Mr. Shoemake and Defendant discuss the effects of heroin.

A third controlled buy was set up between Mr. Shoemake and Defendant on March 29, 2016. On this date, Mr. Shoemake was prepared to purchase one gram of heroin for $300. Mr. Shoemake went to Defendant's house and gave Defendant $300 for the heroin. Agent George was not outside Defendant's house on this date. Other officers were set up for surveillance outside Defendant's house. Agent George set up at Mr. Haithcote's house because he thought that Defendant and Mr. Shoemake would drive to this location to retrieve the heroin.

Agent George eventually saw Defendant arrive in Mr. Shoemake's minivan. Defendant exchanged items with Mr. Haithcote and the two men stood outside and talked before entering the residence for a brief period of time. Defendant exited the house eventually and returned home. Mr. Shoemake left Defendant's home and went to the prearranged meeting place where he turned over the drugs to officers. Mr. Shoemake received a text later that day from Defendant. The text read, "I know what you did."

Later that day, Agent George requested and received a search warrant for Mr. Haithcote's home. During the execution of the search warrant officers recovered 3.65 grams of heroin similar in color and texture to the heroin Mr. Shoemake purchased from Defendant. Officers also located $370 in a coat pocket in the master bedroom. Two of the $20 bills matched the funds used for the controlled buy of heroin on March 24. Officers also recovered $360 on Mr. Haithcote's person. Of this money, $300 matched the money provided for the controlled buy on March 29.

After searching Mr. Haithcote's residence, Agent George and Assistant Director Miller returned to Defendant's house. Agent George explained to Defendant that the Drug Task Force was involved in controlled buys of pills, cocaine, and other drugs in addition to heroin. Agent George then advised Defendant and Ms. Ware of their rights prior to interviewing them. Defendant admitted that he was involved in redistributing prescription medication for money. Defendant claimed that he was engaged in the process of "flip[ping]" drugs and was doing so to support his own heroin habit. Defendant acknowledged to Agent George that he sold pain medication and oxycodone and that he sold heroin for other people. Neither Defendant nor Ms. Ware were arrested at the time, as they expressed interest in cooperating with law enforcement. Officers seized prescription medication including oxycodone and morphine, marijuana, and drug paraphernalia from Defendant's home.

As a result of the activities that took place in March of 2016, Defendant was indicted by the Bedford County Grand Jury in May of 2017 for the following offenses:

- 4 -

| Count | Charge |
|-------|--------|
| 1 | Sale of oxycodone |
| 2 | Delivery of oxycodone |
| 3 | Sale of heroin |
| 4 | Delivery of heroin |
| 5 | Conspiracy to sell and deliver heroin |
| 6 | Sale of heroin |
| 7 | Delivery of heroin |
| 8 | Conspiracy to sell and deliver heroin |
| 9 | Possession of oxycodone for resale |
| 10 | Possession of oxycodone for delivery |
| 11 | Possession of morphine for resale |
| 12 | Possession of morphine for delivery |

After a jury trial, at which Defendant did not present any proof, Defendant was found guilty as charged in Counts 1-8 and of the lesser included offense of simple possession in Counts 9-12. The trial court merged Counts 1 and 2 and imposed a sentence of ten years; merged counts 3 and 4 and imposed a sentence of twenty years, imposed a sentence of ten years in Count 5; merged Counts 6 and 7 and imposed a sentence of twenty years, imposed a sentence of ten years in Count 8; merged Counts 9 and 10 and imposed a sentence of eleven months and twenty-nine days; and merged Counts 11 and 12 and imposed a sentence of eleven months and twenty-nine days. The trial court ordered the sentences to be served concurrently for a total effective sentence of twenty years as a Range II, multiple offender.

Defendant filed a motion for new trial in which he challenged the sufficiency of the evidence and his sentence. Defendant timely appealed to this Court.

*Analysis*

On appeal, Defendant first argues that the evidence was insufficient to sustain the convictions. Defendant admits that "there was ample proof that [Defendant] delivered a controlled substance to a confidential informant" but insists that his voluntary intoxication negated the specific intent required for the conviction. As part of this issue, Defendant complains that the trial court failed to instruct the jury on voluntary intoxication. Defendant also contends that there was no proof of an overt act to establish the existence of a conspiracy. The State insists that the evidence supports the jury verdict.

We have routinely explained the well-settled principles that guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As pertinent to this case, it is an offense for a defendant to knowingly sell or deliver a controlled substance. T.C.A. § 39-17-417(a)(2) & (3). Heroin is a Schedule I controlled substance pursuant to Tennessee Code Annotated section 39-17-406(c)(11) and oxycodone is a Schedule II controlled substance pursuant to Tennessee Code Annotated section 39-17-408(b)(1)(M). "Delivery" is defined as the actual, constructive, or attempted transfer of a controlled substance from one person to another. T.C.A. § 39-17-402(6). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). Intent may be inferred "from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419.

A conspiracy is committed if:

two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the

purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

(b) If a person guilty of conspiracy, as defined in subsection (a), knows that another with whom the person conspires to commit an offense has conspired with one (1) or more other people to commit the same offense, the person is guilty of conspiring with the other person or persons, whether or not their identity is known, to commit the offense.

(c) If a person conspires to commit a number of offenses, the person is guilty of only one (1) conspiracy, so long as the multiple offenses are the object of the same agreement or continuous conspiratorial relationship. . . .

T.C.A. § 39-12-103(a)-(c). A criminal conspiracy requires an "overt act in pursuance of the conspiracy." T.C.A. § 39-12-103(d).

The proof at trial, in a light most favorable to the State, showed that Mr. Shoemake worked with the Drug Task Force as a confidential informant to purchase oxycodone and one-half a gram of heroin from Defendant on March 24, 2016 and one gram of heroin on March 29. Before each controlled buy, Mr. Shoemake met with an agent of the task force, was searched, provided with marked money, and equipped with a recording device. Agents listened to the transactions between Defendant and Mr. Shoemake and watched portions of each transaction from their surveillance vantage points. After each transaction, Mr. Shoemake was debriefed. His explanation of each transaction was consistent with the description of the transaction given by the agent who observed the activity. Agent George recognized Defendant and Ms. Ware's voices on the various recordings. Moreover, Defendant was seen on two separate occasions getting into Mr. Shoemake's car and going to Mr. Haithcote's house to purchase heroin for Mr. Shoemake. The drugs provided to the CI by Defendant were tested by the Tennessee Bureau of Investigation lab and determined to be oxycodone and heroin. Two of the counts of the indictment, 5 and 8, charged Defendant with conspiracy. Each of the counts specifically alleged an overt act, specifying the activity observed by task force agents and relayed to the agents by Mr. Shoemake. The testimony at trial revealed that on two separate occasions, Defendant purchased heroin from Mr. Haithcote to sell to Mr. Shoemake. In drug conspiracy cases, transportation of the drug is an overt act in furtherance of the conspiracy. *See State v. Martinez*, 372 S.W.3d. 598 607 (Tenn. Crim. App. 2011). The evidence was sufficient to support the convictions.

As part of his argument with regard to sufficiency of the evidence, Defendant argues that the trial court erred by failing to charge the jury on voluntary intoxication. We acknowledge that "a defendant has a right to a correct and complete charge of the law,"

*State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001), and the trial court has the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998). Tennessee law, however, does not mandate that any particular jury instructions be given, so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). However, we agree with the State that this issue is waived due to Defendant's failure to include it in his motion for new trial. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial[.]"); *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (holding that failure to object to erroneous definitions of intentionally and knowingly did not waive error but failure to include issue in motion for new trial did). Accordingly, the issue is waived.

*Sentencing*

Lastly, Defendant challenges his sentence as excessive. Defendant claims that the trial judge did not make sufficient findings of fact and failed to give reasons for sentencing Defendant to the maximum sentence in the range. The State claims that Defendant has waived the issue.

In our review of the record, we note that the record contains a transcript of the sentencing hearing. However, the same appears to be incomplete. The last page of the sentencing hearing transcript contains a statement by the trial court that his "staff is needing a break, and I am going to take a look at this and give it all due consideration and be fair to both sides." It is not clear whether the hearing continued at some point or if there is another volume of the transcript that was not filed with this Court.

The absence of the complete sentencing hearing transcript from the appellate record precludes our review of the trial court's imposition of Defendant's sentences. *See* Tenn. R. App. P. 24(b) (noting that the appellant has the duty to have prepared those parts of the proceedings which are "necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"). In the absence of a complete record, this Court is precluded from reviewing any issues raised by an appellant and must presume the trial court's findings were correct. *See State v. Troutman*, 979 S.W.2d 271 (Tenn. 1998) (holding that failure to include trial transcript on appeal waived challenge to sentence); *State v. Ballard*, 855 S.W.2d 557 (1993) (holding failure to include transcript precludes appellate review); *State v. Oody*, 823 S.W.2d 554 (Tenn. Crim. App. 1991) (holding trial court's ruling presumed correct in absence of an adequate record on appeal). Without the transcript of the sentencing hearing in its entirety, we must presume that the trial court correctly sentenced Defendant.

- 8 -

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____

TIMOTHY L. EASTER, JUDGE